IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

MICHAEL KEVIN HOFFMAN,           :
                                 :
        Plaintiff,               :
                                 :
    v.                           : Civ. Action No. 07-261-JJF
                                 :
CORRECTIONAL MEDICAL SERVICES    :
and WARDEN ROBERT GEORGE,        :
                                 :
        Defendants.              :

Michael Kevin Hoffman, Pro se Plaintiff, Bear, Delaware.

James Edward Drnec, Esquire, Balick & Balick, LLC, Wilmington, Delaware. Attorney for Defendant Correctional Medical Services.

Catherine C. Damavandi, Esquire, Deputy Attorney General, Delaware Department of Justice. Attorney for Defendant Warden Robert George.

**MEMORANDUM OPINION**

July 8, 2010
Wilmington, Delaware

Farnan, District Judge

Pending before the Court are Motions For Summary Judgment filed by Defendant Correctional Medical Services, Inc., ("CMS") and State Defendant former Warden Robert George ("George").[1] (D.I. 74, 81.) Plaintiff did not file an answering brief to the Motions as ordered by the Court. (See D.I. 87.) For the reasons discussed, the Court will grant Defendants' Motions.

I. BACKGROUND

Plaintiff Michael Kevin Hoffman ("Plaintiff"), a former inmate incarcerated within various Delaware Department of Correction ("DOC") institutions, filed this lawsuit pursuant to 42 U.S.C. § 1983. He proceeds pro se and has been granted leave to proceed in forma pauperis. The Court has jurisdiction pursuant to 28 U.S.C. § 1331.

The following facts are taken from the Complaint and other documents and exhibits submitted by the parties. The circumstances relevant to Plaintiff's claims occurred during the time he was housed at the Sussex Violation of Probation Center ("SVOP"), Georgetown, Delaware, the Central Violation of

---

[1] CMS and George are the only remaining Defendants in this action. All other Defendants were dismissed by the Court on July 3, 2007. (D.I. 17, 18.)

1

Probation Center ("CVOP"), Smyrna, Delaware, and the Sussex Work Release Center ("SWRC"), Georgetown, Delaware.[2]

On June 14, 2006, Plaintiff was transferred to the Sussex Community Corrections Center ("SCCC"), Georgetown, Delaware, and housed in the SVOP where he remained until June 29, 2006. He was transferred to the CVOP on June 29, 2006, and remained there until August 2, 2006, when he was transferred to the Plummer Community Corrections Center, ("PCCC"), Wilmington, Delaware. On August 4, 2006, he was transferred to the SWRC. On August 15, 2006, he returned to the SVOP, and he left the SVOP on September 12, 2006. He returned to the SWRC on October 10, 2006. Next, Plaintiff was moved to the Howard R. Young Correctional Institution ("HYRCI"), Wilmington, Delaware, and on October 18, 2006, Plaintiff was transferred to the Sussex Correctional Institute ("SCI"), Georgetown, Delaware. Plaintiff remained at the SCI until his transfer to the James T. Vaughn Correctional Center ("VCC"), Smyrna, Delaware, on January 29, 2007. He was released from prison on August 22, 2007. (D.I. 83, ex. 6.)

Plaintiff is HIV positive. He alleges that CMS staff failed to provide him medical treatment during the time he was housed at the SVOP, and when SVOP Warden George became aware of his medical

---

[2] All other claims have been dismissed. (Id.)

condition he had Plaintiff transferred to the CVOP. Plaintiff alleges that medical appointments were scheduled at CVOP, but he did not receive medical treatment because he was transferred to the SWRC, and was once again under the supervision of George. Plaintiff alleges that he remained at SWRC for five months without receiving medical treatment. (D.I. 2, 19.)

George is the former Warden of the SCCC which includes the SVOP and the SWRC.[3] Plaintiff's SCCC intake screening report, completed on June 14, 2006, states that he is HIV positive, had seen a physician during the prior six months, and was not currently taking any medications. (D.I. 76 at 1-4.) Five days following his arrival, on June 19, 2006, George received a certified letter from Plaintiff's mother dated June 14, 2006, advising George that Plaintiff was diagnosed with AIDS "due to your lack of proper attention in providing him with medication during the time he was incarcerated at your facility." (D.I. 83, ex. 1.) The letter was not sent to CMS. (D.I. 75, ex. C at 76.)

Plaintiff's medical records indicate that he was not taking any HIV medications prior to his June 2006 SCCC incarceration, although he had been receiving HIV care at the Christiana Care HIV Program, his last visit occurring October 26, 2005, and labs

---

[3] The current warden is Bill Oettel.

3

drawn on June 6, 2006.[4] (D.I. 76 at 9; D.I. 83, ex. 3.) Plaintiff testified, however, that he was taking medication and could not explain the physician's notes. (D.I. 75, ex. C at 35.) Plaintiff testified that prior to his incarceration he was prescribed HIV medication by Dr. Szabor, and that the issue was addressed at the SVOP, but he was not prescribed the medications. (D.I. 75, ex. C at 61.) He also testified that his mother's letter was inaccurate and that he did not "know why she would state that I have AIDS because I don't." (D.I. 83, ex. 2 at 59.)

George met with Plaintiff to discuss the issue on the same day he received the letter. (Id. at ex. 4.) George contacted medical to see if Plaintiff was incarcerated at SCCC and inquired if Plaintiff had seen a physician. George verified that Plaintiff had a medical appointment scheduled for the following Thursday. (Id.) During the meeting, Plaintiff discussed with George his concerns regarding the work release program. (Id.) Plaintiff submitted a sick call request on June 22, 2006. (D.I. 76 at 10.)

On June 29, 2006, Plaintiff was transferred to CVOP and remained there until August 2, 2006. He testified that he was to

---

[4] Plaintiff's CD4 was 235 and his viral load was 184,000. Due to his arrest, he did not keep his scheduled June 13, 2006 appointment. (D.I. 76 at 12.)

4

be placed at SWRC, but instead, two days after he and George discussed his mother's letter, he was sent to the CVOP. Plaintiff has no proof, but suspects the transfer to CVOP was due to HIV discrimination. (D.I. 75, ex. C at 72-73.)

Also prior to his transfer from the SCCC to CVOP, Plaintiff wrote to George twice requesting assistance with the work release program. (D.I. 83, ex. 4.) In the first letter, dated June 28, 2006, Plaintiff questioned why he was not sent to work release. He states that he "should be at work release or send me to CVOP to wait for work release." (Id.) In the second letter, written the next day, Plaintiff complains that he was the only person not sent to work release, that he had agreed to medical treatment at SCCC, and asked George to work with him to get to work release. (Id.) Plaintiff testified that he wrote to George on several occasions, but he received no reply. (D.I. 75, ex. C at 56.)

According to Plaintiff, George should have notified the medical department regarding his needed treatment, but he failed to address his medical issues and provide him with treatment. (Id. at 62.) Plaintiff alleges that while he was held at SCCC in June 2006 "under the care of the [l]isted Defendant Robert George" he did not receive "monitoring, and medication treatment" for HIV/Chronic [sic] care. (D.I. 19.)

5

While at the SCCC, Plaintiff's medical records were reviewed on June 23, 2006, and on June 27, 2006, he was seen in the Chronic Care Clinic regarding his HIV status. (D.I. 76 at 11-13.) Labs and a follow-up with Dr. McDonald were ordered. (Id. at 13.)

Upon his arrival at the CVOP on June 29, 2006, Plaintiff had no complaints of pain or discomfort and medications were ordered. (Id. at 76.) At the CVOP Plaintiff submitted sick call requests on July 3 and July 24, 2006. (Id. at 16-17.) He was seen on July 8 and labs were drawn on July 21, 2006.[5] (Id. at 11, 16.) When Plaintiff was seen on November 16, 2006, it was noted that as of July 2006, his "HIV status [was] overall stable" and that lab work would be repeated. (Id. at 47.)

When he returned to the SCCC, Plaintiff submitted sick call requests in 2006 on August 4, 6, 17, and 24, and September 4, 12, and September 27. (Id. at , 21, 22, 25, 26, 30, 31, 34, 37.) On August 4, 2006, Plaintiff, now at the SWRC, was referred to chronic care. (Id. at 11.) He received medical treatment on August 8, August 23, September 4, September 6, September 15, and October 2, 2006. (Id. at 22, 24, 27, 32-37.)

---

[5] The results indicated a CD4 level of 271 and a viral load of 154,161. (Id. at 19.)

6

Following his transfer to the SCI, Plaintiff submitted sick call requests in 2006 on October 31; November 4, 12, 13, 27, and 28; and December 9, 10, 12, 17, and 18; and in 2007 on January 4, 8, 9, 14, 15, 19, 22, and 24. (Id. at 38, 39, 42, 43, 48, 49, 52-54, 57-63, 66, 67, 71, 72, 74, 75.) He received medical treatment on November 6, 2006, and medication and labs were ordered on November 8, 2006. (Id. at 14, 38.) Plaintiff was seen on November 14 and 15, 2006, and in the Chronic Care Clinic on November 16, 2006. (Id. at 14, 44-47.) He received treatment on November 29, 2006, and on January 10, 16, and 23, 2007, and was seen in the Chronic Care Clinic on January 18, 2007. (Id. at 50, 51, 64-66, 69-71.) Plaintiff refused labs on January 17, 2007, and began receiving Acyclovir on January 20, 2007. (Id. at 68.) He received medication on January 23 and was seen on January 25, 2007. (Id. at 74, 75.)

Plaintiff was transferred to the VCC and submitted medical requests in 2007 on January 29; February 1, 7, 11, and 13; and March 4. (Id. at 78-82, 86, 87.) He received medical care on February 2 and 8, 2007. (Id. at 79-80.) Labs were drawn on February 12[6], and Plaintiff received medical treatment on February 14, 2007. Plaintiff was later provided medication.

---

[6] The results indicated an improved CD4 level and a viral load below 100,000. (D.I. 76, at 85.)

(Id. at 70, 83-86.) Plaintiff was seen on March 19, 2007, and medications were ordered. (Id. at 88-89.) Plaintiff began receiving medication for his HIV condition in March 2007.[7] (D.I. 75, ex. C at 8.) Plaintiff was seen in the Chronic Care Clinic on March 22, 2007, and prescribed medication and a chest x-ray. (D.I. 76 at 89-91.) On March 24, 2007, HIV labs were ordered, and Plaintiff was seen in medical on March 26, 2007. (Id. at 89, 92.)

Dr. Lawrence McDonald ("Dr. McDonald"), a CMS physician, is familiar with Plaintiff's course of treatment and medical history. He states that in 2006, the standard treatment for HIV was to begin acute treatment when CD4 levels fell below 200. Plaintiff's lab results in July 2004 indicated a CD4 level of 271. The standard for treatment changed in 2007, to indicate treatment when CD4 levels fell below 350. Plaintiff's lab results in February 2007, indicated a CD4 level of 338, and Plaintiff began receiving HIV medication in March 2007.[8] (D.I. 75, Ex. A.)

---

[7] Plaintiff testified that between June 2006 and February 2007, he submitted many sick call requests seeking HIV medications, but none of his written requests for medical treatment ask for HIV treatment or medication. (D.I. 75, ex. C at 12.)

[8] The record contains additional medical records, but they are not relevant to the issues that remain in this case.

8

According to Lt. Dean Blades ("Blades"), in 2006, Plaintiff did not file any grievances relating to medical treatment at SCCC. (D.I. 83, ex. 5.) Prison records indicate that Plaintiff filed one grievance, on June 28, 2006, regarding the work release program, but he did not appeal the decision. Id. Plaintiff testified that he submitted five or six grievances while at the SVOP, but received no responses.[9] (D.I. 75, ex. C. at 57, 64.) He asked the medical staff about his grievances. (Id. at 64.) In the grievances, Plaintiff requested HIV medication and blood work. (Id. at 66.) Plaintiff never appealed because there were no resolutions to his grievances, and therefore, nothing to appeal. (Id. at 72.)

## II. STANDARD

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of proving that no genuine issue of material fact exists. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574,

---

[9] The record contains grievances for medical care submitted by Plaintiff in 2007 on the following dates: March 3 and 15; April 9, 18, and 26; May 1, 6, 16, and 29; July 20, and August 2 and 3, 2007. (D.I. 70.)

9

586 n.10 (1986). The facts must be viewed in the light most favorable to the non-moving party, and all reasonable inferences from the evidence must be drawn in that parties' favor. Conopco, Inc. v. United States, 572 F.3d 162, 165 (3d Cir. 2009). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" Marino v. Industrial Crating Co., 358 F.3d 241, 247 (3d Cir. 2004) (quoting Anderson, 477 U.S. at 255).

A party opposing a summary judgment motion must respond with affidavits or depositions setting forth "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The non-moving party "cannot simply reassert factually unsupported allegations contained in his pleadings." Williams v. West Chester, 891 F.2d 458, 460 (3d Cir. 1989). If the non-moving party does not file a response, the Court will not grant the entry of summary judgment without considering the merits of a defendant's unopposed motion. Stackhouse v. Mazurkiewicz, 951 F.2d 29, 30 (3d Cir. 1991) (holding that a district court should

not have granted summary judgment solely on the basis that a motion for summary judgment was not opposed").

Both Defendants move for summary judgment on the grounds that Plaintiff did not exhaust his administrative remedies. (D.I. 75, 82.) Additionally, CMS moves for summary judgment on the grounds that Plaintiff failed to allege or show that CMS instituted a policy or custom demonstrating deliberate indifference, and CMS was not deliberately indifferent to a serious medical condition. (D.I. 75.) George moves for summary judgment on the additional grounds that Plaintiff failed to allege a deliberate indifference claim against him; he had no personal involvement in the alleged wrongs asserted by Plaintiff; and he is entitled to Eleventh Amendment immunity in his official capacity and qualified immunity in his individual capacity. Plaintiff did not respond to the Motions.

## III. DISCUSSION

### A. Whether CMS Is Entitled To Summary Judgment

The Eighth Amendment proscription against cruel and unusual punishment requires that prison officials provide inmates with adequate medical care. <u>Estelle v. Gamble</u>, 429 U.S. 97, 103-105 (1976). In order to set forth a cognizable claim for an Eighth Amendment violation, an inmate must allege (i) a serious medical need and (ii) acts or omissions by prison officials that indicate

11

deliberate indifference to that need. Estelle v. Gamble, 429 U.S. at 104; Rouse v. Plantier, 182 F.3d 192, 197 (3d Cir. 1999).

A corporation, such as CMS, cannot be held liable under a theory of respondeat superior but can be held liable for a policy or custom that demonstrates deliberate indifference. Board of County Comm'rs of Bryan County v. Brown, 520 U.S. 397, 404 (1997); Grayson v. Mayview State Hosp., 293 F.3d 103, 107 (3d Cir. 2002). In order to establish that CMS is directly liable for the alleged constitutional violations, Plaintiff "must provide evidence that there was a relevant [CMS] policy or custom, and that the policy caused the constitutional violation[s] [plaintiff] allege[s]." Natale v. Camden County Corr. Facility, 318 F.3d 575, 584 (3d Cir. 2003) (because respondeat superior or vicarious liability cannot be a basis for liability under 42 U.S.C. § 1983, a corporation under contract with the state cannot be held liable for the acts of its employees and agents under those theories). Assuming the acts of a defendant's employee have violated a person's constitutional rights, those acts may be deemed the result of a policy or custom of the entity for whom the employee works, thereby rendering the entity liable under § 1983, where the inadequacy of existing practice is so likely to result in the violation of constitutional rights that the policymaker can reasonably be said

to have been deliberately indifferent to the need. See Natale, 318 F.3d at 584 (citations omitted). "'Policy is made when a decisionmaker possess[ing] final authority to establish . . . policy with respect to the action issues an official proclamation, policy or edict.'" Miller v. Corr. Med. Sys., Inc., 802 F. Supp. 1126, 1132 (D. Del. 1992) (alteration in original) (quoting Andrews v. City of Philadelphia, 895 F.2d 1469, 1480 (3d Cir. 1990)). "Custom, on the other hand, can be proven by showing that a given course of conduct, although not specifically endorsed or authorized by law, is so well-settled and permanent as virtually to constitute law." Id. (citing Andrews, 895 F.2d at 1480; Fletcher v. O'Donnell, 867 F.2d 791, 793-94 (3d Cir. 1989)).

CMS contends that Plaintiff has failed to sustain his burden of demonstrating that CMS established a custom or policy of deliberate indifference relevant to Plaintiff's medical care. The medical records indicate that on almost every occasion that Plaintiff submitted a medical request, he received medical care. Plaintiff complains that there was a delay in providing him HIV medication. In dispute is whether Plaintiff was taking HIV medication at the time he arrived at the SCCC. During his deposition Plaintiff testified that he was taking medication, but his medical records indicate that he was not. Regardless, it is

undisputed that during the relevant time period, CMS administered to Plaintiff the current standard of care in the treatment of individuals who are HIV positive. Moreover, once Plaintiff's medical condition warranted it, and in accordance with the prevailing standard of care, Plaintiff was provided medication to treat the condition. Finally, there is no evidence before the Court of a CMS policy or custom that violated Plaintiff's constitutional rights. Accordingly, the Court concludes that a reasonable jury could not find that CMS violated Plaintiff's constitutional rights in these circumstances, and therefore, the Court will grant the Motion For Summary Judgment filed by CMS.

**B. Whether Warden George Is Entitled To Summary Judgment**

With regard to medical needs, a prison official is deliberately indifferent if he knows that a prisoner faces a substantial risk of serious harm and fails to take reasonable steps to avoid the harm. Farmer v. Brennan, 511 U.S. 825, 837 (1994). A prison official may manifest deliberate indifference by "intentionally denying or delaying access to medical care." Estelle v. Gamble, 429 U.S. at 104-05. However, "a prisoner has no right to choose a specific form of medical treatment," so long as the treatment provided is reasonable. Harrison v. Barkley, 219 F.3d 132, 138-140 (2d Cir. 2000). An inmate's claims against members of a prison medical department are not viable under §

14

1983 where the inmate receives continuing care, but believes that more should be done by way of diagnosis and treatment and maintains that options available to medical personnel were not pursued on the inmate's behalf. Estelle v. Gamble, 429 U.S. 97, 107 (1976). "[M]ere disagreement as to the proper medical treatment" is insufficient to state a constitutional violation. See Spruill v. Gillis, 372 F.3d 218, 235 (3d Cir. 2004) (citations omitted).

Finally, prison administrators cannot be deliberately indifferent "simply because they failed to respond directly to the medical complaints of a prisoner who was already being treated by the prison doctor." Durmer v. O'Carroll, 991 F.2d 64, 69 (3d Cir. 1993). "If a prisoner is under the care of medical experts . . . a non-medical prison official will generally be justified in believing that the prisoner is in capable hands." Spruill v. Gillis, 372 F.3d 218, 236 (3d Cir. 2004) (discussing Durmer, 991 F.2d at 69). "[A]bsent a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner, a non-medical prison official . . . will not be chargeable with the Eighth Amendment scienter requirement of deliberate indifference." Id. at 236.

George argues that there is no evidence demonstrating his deliberate indifference towards Plaintiff's medical needs and

that he was not personally involved in the allegations set forth in the Complaint. The record reflects that five days after Plaintiff arrived at the SCCC, George received a letter from Plaintiff's mother concerning his medical condition. George immediately took action to determine if Plaintiff was incarcerated at the SCCC, met with Plaintiff to discuss his medical condition, and contacted medical personnel to verify that a medical appointment was scheduled for Plaintiff. Plaintiff was seen by medical personnel prior to his transfer to the CVOP. While Plaintiff alleges that George had him transferred because of his medical condition, there is nothing in the record to support this allegation. Indeed, Plaintiff's letters to George concern his work release assignment. George had no involvement with respect to Plaintiff's medical care while he was at the CVOP, an institution that is not under the umbrella of the SCCC.

    The record also reflects that after he returned to the SCCC, Plaintiff regularly received medical care. Hence, without evidence to the contrary, the Court concludes that George was justified in believing that Plaintiff was receiving adequate medical care. Finally, "absent viable claims that the medical defendants violated his constitutional rights [plaintiff] cannot state a claim against the non-medical defendants for failure to cure the medical defendants' conduct." Serrano v. Folino, 339 F.

App'x 254,258 (3d Cir. 2009) (citation omitted). In this case, Plaintiff maintains no such viable claims against any medical defendants.

Accordingly, based on the foregoing, the Court concludes that a reasonable jury could not find that George was deliberately indifferent to Plaintiff's medical needs when George was initially informed of Plaintiff's condition. In addition, the Court concludes that George had no involvement with Plaintiff's treatment once Plaintiff returned to the SCCC. Finally, it appears to the Court that Plaintiff's principle complaint is that he did not receive the treatment he believed was necessary, even though it was not medically indicated. Disagreement with medical care, however, does not rise to the level of a constitutional violation. Accordingly, the Court will grant the Motion For Summary Judgment filed by George.

## IV. CONCLUSION

For the reasons discussed, the Court will grant Defendants' Motions For Summary Judgment.[10] (D.I. 74, 81.)

An appropriate Order will be entered.

---

[10] In light of the Court's determination that there was no violation of Plaintiff's constitutional rights, the Court will not address the remaining grounds for summary judgment raised by Defendants.

17